IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ESTHER MORGAN,

      Plaintiff,

CASE NO.: _1:07 - cv - 44_  spm/AK

vs.

MERCK & CO., INC.; PFIZER INC.;
PHARMACIA CORPORATION,
a wholly-owned subsidiary of PFIZER INC.;
and PHARMACIA & UPJOHN COMPANY,
LLC, a wholly-owned subsidiary of
PHARMACIA CORPORATION,

STATE CASE NO.:
01-07-CA-621

      Defendants.
_____/

## NOTICE OF REMOVAL

      PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1441 and 1446,

defendants Pfizer Inc. (hereinafter "Pfizer"), Pharmacia Corporation (hereinafter

"Pharmacia"), and Pharmacia & Upjohn Company LLC (incorrectly captioned as

"Pharmacia & Upjohn Company, LLC") hereby jointly file this Notice of Removal from

the Circuit Court in and for Alachua County, Florida to the United States District Court for

the Northern District of Florida, Gainesville Division. The grounds for removal are as

follows:

### THE REMOVED CASE

      1.    The removed case is a civil action filed on or about February 6, 2007 in the

Circuit Court in and for Alachua County, Florida, having been assigned Case No. 01-07-

07 MAR 19  AM 9: 46
LT

TPA#2338274.1

FILED

CA-621, and captioned <u>Esther Morgan v. Merck & Co., Inc., et al.</u>  This Court has original

jurisdiction over this action under 28 U.S.C. § 1332, and this action is removable under 28

U.S.C. § 1441(b), in that it is a civil action between citizens of different states and the

matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2.      This is a product liability action arising out of plaintiff's alleged use of

Bextra® and Vioxx®, FDA-approved prescription medicines.  On September 6, 2005, the

Judicial Panel on Multidistrict Litigation (the "JPML") issued an order, pursuant to 28

U.S.C. § 1407, establishing an MDL proceeding in the Northern District of California

(hereinafter referred to as MDL-1699) for cases such as this related to Bextra®.  <u>See</u> <u>In re</u>

<u>Bextra & Celebrex Mktg., Sales Pracs. & Prods. Liab. Litig.</u>, 391 F. Supp. 2d 1377 (JPML

2005).  Accordingly, this case is expected to become a "tag-along" action transferable to

MDL-1699 pursuant to the Rules of Procedure of the JPML.  <u>See Rules of Procedure of the</u>

<u>Judicial Panel on Multidistrict Litig.</u>, 199 F.R.D. 425 (JPML 2001).  The removing

defendants will file a motion to stay all proceedings pending MDL transfer.

## PAPERS FROM REMOVED ACTION

3.      As required by 28 U.S.C. § 1446(a) and Local Rule 7.2(A), attached as

Exhibit A are copies of all process, pleadings, orders, and other papers or exhibits filed in

the state court.

## THE REMOVAL IS TIMELY

4.      Plaintiff commenced this action on or about February 6, 2007, and served

Merck & Co., Inc. ("Merck"), Pfizer, Pharmacia, and Pharmacia & Upjohn Company LLC

on February 26, 2007.  Therefore, this Notice of Removal is timely filed within 30 days of

receipt of the initial pleading and within one year of commencement of the action.

## CONSENT TO REMOVAL

5.      All defendants have joined in or consented to this removal.  Defendant

Merck consents to this Notice of Removal.  Its written consent to removal is attached as

Exhibit B.

## THE VENUE REQUIREMENT IS MET

6.      Venue of this removal is proper under 28 U.S.C. § 1441(a) to the Northern

District of Florida, Gainesville Division because the Circuit Court of Alachua County,

Florida is within the Gainesville Division.

## DIVERSITY OF CITIZENSHIP EXISTS

7.      This is a civil action that falls under the Court's original jurisdiction under

28 U.S.C. § 1332 (diversity of citizenship) and is one that may be removed to this Court

based on diversity of citizenship under 28 U.S.C. §§ 1441 and 1446.  There is complete

diversity of citizenship and no properly joined and served defendant is a citizen of Florida.

8.      Plaintiff is, and was at the time this action was filed, a citizen of the State of

Florida.  See Complaint ¶ 2.  Plaintiff's Complaint alleges only her residency; however,

publicly available records indicate that plaintiff is and was a Florida citizen living in

Gainesville, Florida within Alachua County, Florida, since May 2006.  Publicly available

records also show that plaintiff owns property in Florida.

9.      Defendant Merck is, and was at the time this action was filed, a corporation

organized under the laws of the State of New Jersey, with its principal place of business at

One Merck Drive, White House Station, New Jersey, and therefore is a citizen of New Jersey for purposes of determining diversity under 28 U.S.C. § 1332(c)(1).

10.    Defendant Pfizer is, and was at the time this action was filed, a corporation existing under the laws of the State of Delaware, with its principal place of business in the State of New York, and therefore is a citizen of Delaware and New York for purposes of determining diversity under 28 U.S.C. § 1332(c)(1).

11.    Defendant Pharmacia is, and was at the time this action was filed, a corporation existing under the laws of the State of Delaware, with its principal place of business in the State of New Jersey, and therefore is a citizen of Delaware and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332(c)(1).

12.    Defendant Pharmacia & Upjohn Company LLC is, and was at the time this action was filed, a limited liability company whose sole member is (and was) Pharmacia & Upjohn LLC, a limited liability company whose sole member is (and was) Pharmacia Corporation, which is a Delaware corporation with its principal place of business in New Jersey.  Accordingly, Pharmacia & Upjohn Company LLC is a citizen of Delaware and New Jersey.  See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C., 374 F.3d 1020, 1022 (11th Cir. 2004) ("[A] limited liability company is a citizen of any state of which a member of the company is a citizen.").

13.    Because the plaintiff is a citizen of Florida and the named defendants are not, complete diversity of citizenship exists under 28 U.S.C. § 1332.

## THE AMOUNT-IN-CONTROVERSY
## REQUIREMENT IS SATISFIED

14.    Where, as here, the jurisdictional amount is not alleged, it can nevertheless

be determined when it is "facially apparent" from the complaint itself.  Williams v. Best

Buy Co., 269 F.3d 1316, 1319 (11th Cir. 2001) (holding that the district court may consider

whether jurisdictional amount is "facially apparent" from the complaint).  A court may also

consider the removal notice and post-removal evidence concerning the amount in

controversy.  See id.  Indeed, defendant's removal papers may supply the required elements

of diversity jurisdiction as follows:

> Allegations in the defendant's petition for removal, if not contradicted by
> the allegations of the complaint, are alone sufficient to establish prima facie
> the existence of federal jurisdiction.  The mere fact that the plaintiff's
> complaint is silent as to some fact necessary to establish federal jurisdiction,
> such as the amount in controversy, does not preclude removal of the case by
> defendant.

Woolard v. Heyer-Schulte, 791 F. Supp. 294, 296 (S.D. Fla. 1992) (citing Wright v. Cont'l

Cas. Co., 456 F. Supp. 1075, 1078 (M.D. Fla. 1978)).

16.    In this case, it is "facially apparent" that the amount in controversy far

exceeds $75,000.  Plaintiff seeks compensatory damages arising out of the alleged use of

the prescription pharmaceutical products Vioxx® and Bextra®, which she claims caused

her to suffer a heart attack.  See Complaint ¶ 3.  Plaintiff alleges that the "heart attack

result[ed] in permanent damages and disability."  Id.  Generally, plaintiff contends that she

"suffered and continues to suffer from" the following:

> serious injuries, including, but not limited to, pain and suffering, physical
> injuries, disability, disfigurement, embarrassment, mental anguish, loss of
> capacity for the enjoyment of life, expenses of hospitalization, medical,
> nursing care and treatment, loss of earnings, loss of the ability to earn
> money in the future, and a shortened life span.

Id. ¶¶ 93, 133.  In addition to "serious personal injury," plaintiff also claims to have

"sustained economic losses, and has expended (and/or may in the future be required to

expend) fair and reasonable expenses for necessary health care, attention and services, and has and/or may incur incidental and related expenses." Id. ¶ 141.

17.    These alleged injuries are at least as serious as others that have been found to satisfy the amount in controversy. For example, in Gebbia v. Wal-Mart Stores, 233 F.3d 880, 881, 883 (5th Cir. 2000), the Fifth Circuit found that alleged damages in a slip-and-fall case for "medical expenses, physical pain and suffering, mental anguish and suffering, loss of enjoyment of life, loss of wages and earning capacity, and permanent disability and disfigurement" from wrist, knee, and back injuries met the jurisdictional amount. See also Stewart v. Tupperware Corp., 356 F.3d 335, 337, 340 (1st Cir. 2004) (alleged auto accident injuries of whiplash, chest trauma, cuts, bruising, and muscle strain, as well as "the mental anguish of spending their honeymoon in a hospital" satisfied the amount in controversy); Nelson v. Family Dollar Stores, Inc., No. Civ. A. 04-2146, 2005 WL 517504, *1-*2 (E.D. La. Feb. 18, 2005) (complaint alleging that store employee pushed hand truck into plaintiff causing headaches, dizziness, blurry vision, spine strain, and general bruises and contusions met jurisdictional threshold).

18.    In addition, reported verdicts and settlements in cases where the alleged injury is a heart attack indicate that damages in such cases exceed $75,000.[1] The allegations of injuries, damages, and conduct in the complaint in this action are

---

[1] See, e.g., Krys v. Lufthansa German Airlines, No. 92-2488 (S.D. Fla. Oct. 24, 1995), 1995 WL 848575, 96 FJVR 3-25 (plaintiff alleging failure to treat heart attack and resulting damage to heart awarded verdict of $2,400,000); Montisano v. Wilson, No. 99-31-534CICI (Volusia Cty. Cir. Ct. Mar. 31, 2003), 2003 WL 21917623, 13 Fla. J.V.R.A. 5:C3 (plaintiff alleging negligent performance of cardiac catheterization and resulting heart attack awarded verdict of $942,700); Heberand v. Rothman, (Broward Cty. Cir. Ct. July 1997), 1997 WL 33345604, 12 Nat. J.V.R.A. 11:12 (plaintiff alleging negligent failure to diagnose cardiac-related symptoms and resulting heart attack awarded verdict of $250,000).

substantially similar to those in other Bextra® actions in which plaintiffs seek
compensatory damages in excess of $75,000.

19.    Moreover, allegations of future damages also factor into the amount in
controversy analysis. See Baker v. Firestone Tire & Rubber Co., 537 F. Supp. 244, 247
(S.D. Fla. 1982) (plaintiff claimed "great expenses for future medical treatment"); see, e.g.,
Cabral v. Willard, 333 F. Supp. 2d 1108, 1113 (D. Kan. 2004) (considering "any additional
damages [plaintiff] is reasonably likely to experience in the future" resulting from auto
accident). Here, plaintiff alleges "permanent damages and disability," including "loss of
the ability to earn money in the future" and that she "(. . . may in the future be required to
expend) fair and reasonable expenses for necessary health care, attention and services, and
has and/or may incur incidental and related expenses." See Complaint ¶¶ 3, 93, 133, 141.
Such claims, considered with the totality of the aforementioned factors, establish that the
amount in controversy here meets the jurisdictional requirement.

20.    Thus, the state court action may be removed to this Court in accordance
with the provisions of 28 U.S.C. § 1441(a) because (i) this action is a civil action pending
within the jurisdiction of the United States District Court for the Northern District of
Florida, Gainesville Division; (ii) this action is between citizens of different states; and (iii)
the amount in controversy exceeds $75,000, exclusive of interest and costs.

### FILING OF REMOVAL PAPERS

21.    Pursuant to 28 U.S.C. § 1446(d), written notice of the removal of this action
will be promptly served to plaintiff's counsel, and a Notice of Filing Notice of Removal is

simultaneously being filed with the Clerk of the Circuit Court in and for Alachua County,

Florida. A true and correct copy of this Notice is attached hereto as Exhibit C.

    **WHEREFORE**, defendants Pfizer, Pharmacia, and Pharmacia & Upjohn

Company LLC hereby remove the above-captioned action from the Circuit Court in and for

Alachua County, Florida, and request that further proceedings be conducted in this Court as

provided by law.

                      Respectfully submitted,

                      Edward W. Gerecke – Trial Counsel
                      Florida Bar No. 328332
                      CARLTON FIELDS, P.A.
                      Post Office Box 3239
                      Tampa, Florida 33601
                      Telephone:    (813) 223-7000
                      Facsimile:    (813) 229-4133
                      E-Mail:      egerecke@carltonfields.com

                      Attorneys for Pfizer Inc., Pharmacia
                      Corporation, and Pharmacia & Upjohn
                      Company LLC

**CERTIFICATE OF SERVICE**

    I CERTIFY that copies of this pleading were mailed to Brenda S. Fulmer, C. Todd

Alley, and James D. Clark, 701 E. Washington Street, P.O. Box 3127, Tampa, Florida

33601, Patricia E. Lowry, John B. T. Murray, Jr., and Dori K. Stibolt, 777 South Flagler

Drive, West Palm Beach, FL 33401, this 16th day of March, 2007.

                      Attorney



## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, STATE OF FLORIDA

ESTHER MORGAN,

      Plaintiff,

vs.

MERCK & CO., INC., PFIZER INC.,
PHARMACIA CORPORATION,
a wholly-owned subsidiary of PFIZER INC., and
PHARMACIA & UPJOHN COMPANY, LLC, a
wholly-owned subsidiary of PHARMACIA
CORPORATION,

      Defendants.

_____/

Case No.: 01.07.CA.621
Division: _____J_____

2007 FEB -8  AM 11: 28
J.K. "BUDDY" IREY
CLERK OF COURTS
ALACHUA COUNTY, FL.
FILED

## COMPLAINT

Plaintiff, ESTHER MORGAN, sues Defendants, MERCK & CO., INC., PFIZER, INC.,

PHARMACIA CORPORATION, a wholly-owned subsidiary of PFIZER, INC., and

PHARMACIA & UPJOHN COMPANY, LLC, a wholly-owned subsidiary of PHARMACIA

CORPORATION, and alleges as follows:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $15,000.00.

2.     Plaintiff, ESTHER MORGAN, at all times material hereto, was a resident of

Alachua County, Florida.

3.     On or about April 4, 2003, Plaintiff ESTHER MORGAN, suffered a heart attack

resulting in permanent damages and disability as a result of her ingestion of Vioxx and Bextra.

4.     MERCK & CO., INC. (hereafter referred to as "MERCK") is a New Jersey

Corporation with its principal place of business located in Whitehouse Station, New Jersey.



1

40

5.      At all times material hereto, MERCK was authorized and did conduct business within the State of Florida.

6.      PFIZER, INC. (hereafter referred to as "PFIZER") is a Delaware Corporation with its principal place of business at 235 E. 42nd Street, New York, NY.

7.      At all times material hereto, PFIZER was authorized and did conduct business within the State of Florida.

8.      PHARMACIA CORPORATION ("PHARMACIA") is a Delaware Corporation with its principal place of business in New Jersey.

9.      At all times material hereto, PHARMACIA was a wholly-owned subsidiary of PFIZER.

10.     PHARMACIA & UPJOHN COMPANY, LLC ("PHARMACIA & UPJOHN") is a Delaware Corporation with its principal place of business in New York.

11.     At all times material hereto, PHARMACIA & UPJOHN, was a wholly-owned subsidiary of Defendant PHARMACIA.

12.     At all times material hereto, PFIZER was responsible for the liabilities of PHARMACIA and PHARMACIA & UPJOHN.

13.     As used herein, Defendants PFIZER, PHARMACIA, and PHARMACIA & UPJOHN are collectively referred to as "BEXTRA DEFENDANTS".

14.     At all times material, the BEXTRA DEFENDANTS were in the business of developing, manufacturing, selling, distributing, labeling, marketing and/or promoting Bextra for consumer use by prescription. THE BEXTRA DEFENDANTS did develop, manufacture, design, package, market, sell and distribute Bextra in the State of Florida at all times relevant to this action.

2

15.    Vioxx and Bextra are among a class of pain medication called non-steroidal anti-inflammatory drugs "NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are examples of well-known NSAIDs.

16.    NSAIDs reduce pain and inflammation by blocking the body's production of pain transmission enzymes called cyclooxygenase (COX-1 and COX-2). COX enzymes trigger the sequential oxidation of various fatty acids to create prostaglandins. Prostaglandins are important cogs in the physiology of pain, igniting hormone-like actions in the immediate vicinity of the cells that release them, thereby inducing inflammation, pain, and fever.

17.    Because COX enzymes and prostaglandins increase the pain associated with tissue injury, the synthesis of prostaglandins by cells of injured tissue becomes a reasonable target for pain-management drugs.

18.    Traditional NSAIDs like aspirin, ibuprofen, and naproxen inhibit both COX-1 and COX-2 enzymes simultaneously, providing relief from the inflammation and pain, but at the cost of potential adverse gastrointestinal effects. The prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus which protects the stomach wall from the hydrocholoric acid present in the stomach. By blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and, as a result, can cause harmful gastrointestinal side effects, including stomach ulcerations and bleeding.

19.    PFIZER and MERCK and other pharmaceutical companies sought to remedy these side effects suffered by some NSAID users by developing "selective" inhibitors, called coxibs, which targeted only COX-2 production; thus (allegedly) allowing for proper maintenance of gastric tissue while still reducing inflammation. Their development was based on the hypothesis that COX-2 was the source of prostaglandins E2 and I2, which mediate inflammation,

3

and that COX-1 was the source of the same prostaglandins in the stomach lining. By not inhibiting COX-1, whose products provide cytoprotection in the gastric epithelium, these coxibs were thought to decrease the incidence of gastric side effects when compared to traditional NSAIDs that inhibit both COX-1 and COX-2.

20. In making this decision, however, PFIZER and MERCK either intentionally ignored and/or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostaglandin I2 levels, the predominant COX-2 product responsible for preventing platelet aggregation and clotting, while leaving thromboxane A2, the potent COX-1 platelet aggregator and vasoconstrictor, unaffected. By selectively inhibiting prostaglandin I2 without similarly suppressing its COX-1 counterpart, Vioxx and other coxibs expose their users to a host of blood clot-related cardiovascular risks, including heart attack, stroke, and unstable angina.

### A.  Factual Background Relating To Defendant, MERCK & CO., INC. ("MERCK") and Vioxx

21. This action arises out of MERCK's manufacturing, selling, distributing, marketing and/or otherwise promoting Vioxx in the State of Florida without proper warnings as to the dangers associated with its use.

22. The pharmaceutical drug Vioxx, manufactured by MERCK & CO., INC., is defective, dangerous to human health, and unfit and unsuitable to be marketed and sold in commerce.

23. At all times material, MERCK was in the business of developing, manufacturing, selling, distributing, labeling, marketing and/or promoting Vioxx (rofecoxib) for consumer use by prescription. MERCK did develop, manufacture, design, package, market, sell and distribute Vioxx in the State of Florida at all times relevant to this action, but withdrew Vioxx from the market on September 29, 2004.

4

24.    In the late 1980s and early 1990s, MERCK was facing a business crisis because patents on several of its best-selling drugs, including Vasotec, Prinivil, Mevacor, Pepcid, and Prilosec were expiring.  Never had a pharmaceutical company faced the loss of so many million dollar patents at the same time.  MERCK management even feared that MERCK might not survive as a company.

25.    In or about the summer of 1992, MERCK began a Cox-2 research program at the MERCK Frosst Centre for Therapeutic Research in Quebec, Canada.  MERCK scientists explored the hypothesis that the therapeutic utilities of NSAIDs were due to inhibition of Cox-2, whereas much of the gastrointestinal toxicity of traditional NSAIDs were due to the inhibition of Cox-1.

26.    At the time, MERCK management realized that the development of an NSAID that operated by selectively blocking Cox-2 could produce a much-needed "blockbuster" for the company.  As the company has acknowledged, the race was on to find a selective inhibitor of Cox-2.

27.    During 1992, MERCK became aware that both DuPont and Taisho, a Japanese pharmaceutical company, had selective Cox-2 inhibitors in development.  Almost every one of the more than three hundred scientists and support staff at MERCK-Frosst Centre for Therapeutic Research worked on the discovery and development of Vioxx.  After discarding one compound because it lacked sufficient selectivity for Cox-2, and another because metabolic studies raised questions of possible drug-to-drug interactions, MERCK continued to research and develop the compound that eventually became known as Vioxx.

5

28.     On or about December 20, 1994, MERCK filed its first investigational new drug (IND) application with the FDA to conduct clinical trials of Vioxx on humans. The intended use of the drug identified in the IND was the treatment of osteoarthritis and acute pain.

29.     MERCK sought to market Vioxx as an alternative to earlier NSAIDs such as aspirin, which had frequently been associated with adverse gastrointestinal side effects. As early as November 1996, years before FDA approval of Vioxx in May of 1999, MERCK recognized that unless taken in conjunction with aspirin, Vioxx posed a "substantial risk" of "significantly higher rates" of cardiovascular adverse events such as myocardial infarctions, strokes and transient ischemic attacks because, as a selective Cox-2 inhibitor, it lacked aspirin's "anti-platelet [i.e. anti-clotting] effect".

30.     In fact, early in the development program for Vioxx, to demonstrate that it selectively inhibited Cox-2, MERCK used a platelet aggregation assay to assess the drug's effect on Cox-1. That research established that Vioxx did not affect thromboxane production or platelet aggregation because it did not inhibit Cox-1. In addition, a MERCK-sponsored study found that Vioxx, unlike several other NSAIDs against which it was tested, had no appreciable anti-platelet effect (Protocol 061).

31.     Two months later, in February of 1997, Vioxx researcher Briggs Morrison conceded that "without Cox-1 inhibition you will get more thrombotic events and kill drug."

32.     Responding to this observation, on February 25, 1997, MERCK's Vice President of Clinical Research, Alise Reicin, complained:

> I hear you! This is a no win situation. The relative risk of [adverse GI events with] even low dose aspirin is 2-4 fold.  Yet, the possibility of increased CV [cardiovascular] events of great concern-(I just can't wait to be the one to present those results to senior management!).  What about the idea of excluding high risk CV patients – ie (sic) those that have already had an MI, CABG,

6

PTCA.? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be would we be able to recruit any patients?

33.    In December of 1997, MERCK appointed a "Task Force" to investigate the incidence of cardiovascular serious adverse events in the ongoing Vioxx clinical trials. The reason for the investigation was the unexpected results of an early clinical trial which showed a decline in the levels of PGI-2, the most potent of all inhibitors of platelet aggregation, but no inhibition of systemic thromboxane, in the urinalysis of patients on Vioxx. This imbalance triggered a concern over the potential for thrombotic events.

34.    By early 1998, MERCK's own clinical investigators, [based on findings from a MERCK-sponsored study (protocol 023)] advised the company that by inhibiting Cox-2, Vioxx, at the cellular level of blood vessel linings, may alter the homeostatic balance between prostacyclin (a Cox-2 platelet inhibitor that dilates blood vessels) and thromboxane (a Cox-1 platelet activator that constricts blood vessels) such that it would provoke the creation of blood clots.

35.    The Task Force agreed to investigate the incidence of thrombotic events by analyzing the ongoing osteoarthritis (OA) trials. Because the trials were still blinded as to treatment groups, it could not be determined whether the adverse events in the database had occurred in the Vioxx, placebo or "compared to" drug populations. Therefore, the Task Force designed a study in which cardiovascular events from all arms of the OA trials would be added together, and the combined group's incidence rate would be compared to placebo patients from trials of other MERCK drugs. An expedited time frame was established for completion of the analysis, in light of the rush to get Vioxx to market ahead of its competitors.

7

36.     In January of 1998, the analysis pursuant to the Task Force plan showed a statistically significant increased relative risk of 2.16 for females in the Vioxx study versus the placebo group selected by MERCK for comparison. These results constituted a clear signal of cardiovascular toxicity that should have triggered immediate investigation and concern. Instead, MERCK made an after-the-fact claim that the placebo comparison group must have had an "atypically low" incidence of cardiovascular events, such that the higher rate in the Vioxx group was downplayed. MERCK further downplayed this important safety signal by deciding to compare the rate in the Vioxx group to a so-called "background" rate, even though no such comparison was stated in the plan for the study. MERCK intentionally chose an inappropriate "background" rate for comparison, from a published study of older patients at high risk of cardiovascular disease. Based upon the result of this comparison, MERCK incorrectly dismissed the signal as of no concern. MERCK failed to disclose the results of this pre-marketing analysis, and instead has misrepresented that it had no indication of cardiovascular risks before Vioxx was marketed.

37.     MERCK submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

38.     MERCK also submitted a NDA for rofecoxib to the FDA on November 23, 1998, for oral suspension at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted as NDA 21-052 by the FDA.

8

39.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for the relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

40.     At the time that Vioxx was approved by the FDA, the labeling for rofecoxib (in the section entitled "Special Studies- Upper Endoscopy in Patients with Osteoarthritis") stated "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

41.     The "Warnings" section of the labeling for rofecoxib at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) effects—Risk of GI Ulceration, Bleeding and Perforation."

42.     MERCK submitted a Supplemental New Drug Application ("sNDA") with the goal of establishing a gastrointestinal safety claim for rofecoxib. In conjunction with the sNDA, MERCK conducted a study known as the VIGOR (VIOXX GI Outcomes Research) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-09 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was conducted from January 6, 1999, through March 17, 2000.

43.     The objectives of the VIGOR study were to "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking Vioxx 50mg daily compared to patients in the group taking naproxen 1000 mg/day" and to "study the safety and tolerability" of Vioxx in patients with rheumatoid arthritis.

9

44.    The VIGOR study demonstrated that Vioxx is associated with a lower incidence of serious upper gastrointestinal adverse events of major bleeding, perforation, and obstruction compared to naproxen.

45.    However, the VIGOR study also showed a higher cumulative rate of serious cardiovascular thromboembolic adverse events (such as heart attacks, angina pectoris, and peripheral vascular events) in the Vioxx group compared to the naproxen group.

46.    On or about November 19, 1999, MERCK's senior biostatistician, Deborah Shapiro, provided a tightly controlled, highly confidential interim safety report to the VIGOR study's Data Safety and Monitoring Board ("DSMB"), which showed that almost twice as many serious cardiovascular events were occurring among patients taking Vioxx as among those taking Naproxen.

47.    On or about March of 2000, MERCK released the results of the VIGOR study. The study data revealed, among other things, that Vioxx users suffered five times as many heart attacks than their Naproxen counterparts.  In addition, serious cardiovascular events (including ischemic strokes, unstable angina, and sudden unexplained deaths) were reported for more than twice as many Vioxx as Naproxen patients.

48.    Despite the results of the VIGOR study, MERCK failed to include in its Vioxx label a cardiovascular warning that Vioxx was contraindicated in high risk CV patients or to warn physicians of this enhanced risk.

49.    An FDA report, written by Shari L. Targum, M.D., a Project Manager for the FDA's Division of Anti-Inflammatory Drug Products, dated February 1, 2000, states: "By November 18, 1999, the Data and Safety Monitoring Board of the VIGOR study, a committee independent from MERCK, the sponsor, had become concerned over the "excess

10

deaths and cardiovascular events experienced in Group A [Vioxx] compared to Group B [naproxen]."

50.     On March 9, 2000, shortly after completion of the VIGOR study, Edward M. Scolnick, former president of MERCK Research Laboratories, concluded that "the CV [cardiovascular] events are clearly there" and stated that MERCK should be prepared to "make clear to the world" that Vioxx's cardiovascular toxicity "is a class effect" (i.e. an effect of all of the selective Cox-2 inhibitors and not a risk that was associated only with Vioxx) that is "mechanism based as we worried it was" and as some of the company's consultants had maintained.

51.     MERCK continued to publish and describe that Naproxen had a cardioprotective effect, notwithstanding that Italian pharmacologist Carlo Patrono, one of MERCK's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs (whom MERCK regarded as "the world's most respected and knowledgeable" scientist in his field), advised MERCK in March of 2000 that the dramatic cardiovascular effects observed in the VIGOR study could not plausibly be attributed to Naproxen for several reasons.

52.     Furthermore, on or about March 24, 2000, University of Pennsylvania pharmacologist Garrett Fitzgerald, then acting as a MERCK consultant, advised MERCK of a scientific paper about to be published that included Naproxen among several NSAIDs which, in contrast to aspirin, had no significant effect on the incidence of first nonfatal myocardial infarctions in females in an epidemiological study, providing further notice to MERK that its insistence that Naprosen was cardioprotective was a fallacy.

53.     In June of 2000, in connection with industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which MERCK is a

11

member and corporate sponsor, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did MERCK do nothing to accurately publish these studies, or warn consumers and prescribing doctors, MERCK also denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge from COX-2 Trials,* in August of 2000.

54.    MERCK concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for the success of MERCK as a company. Safety concerns over hypertension, thrombosis, edema, and/or cardiovascular events would have negatively impacted MERCK's positioning in the market as compared to its competitor drug, Bextra (celecoxib), which had been placed into the market by Pharmacia and Pfizer three months prior to the launch of Vioxx.

55.    MERCK continued to deny the ill health effects associated with Vioxx while at the same time reaping benefits obtained through its non-disclosure and concealment. MERCK engaged in a massive physician and direct-to-consumer advertising and sampling program and gained continued increases in the market share, which enhanced MERCK's financial stability to the detriment of its consumers. As a result of MERCK's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and garnered approximately a 23% share of the market.

56.    The FDA sent a letter to MERCK dated December 16, 1999, stating that certain Vioxx promotional pieces "are false and misleading because they contain representations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

57.    On June 22, 1999, MERCK contracted with Peter Holt, M.D., to conduct Vioxx promotional audio conferences, using content provided by MERCK, which were to be presented to health care professionals as educational programs. The conferences (one on June 8, 2000; one

12

on June 13, 2000; one on June 16, 2000, and three on June 21, 2000) were arranged by MERCK,

presented on behalf of MERCK, and moderated by MERCK employees. Some of the content of

these conferences was later found by the FDA to be "false or misleading in that they minimized

the MI results of the VIGOR study, minimized the Vioxx/Coumadin drug interaction, omitted

important risk information, made unsubstantiated superiority claims, and promoted Vioxx for

unapproved uses and an unapproved dosing regimen."

   58.    Further, in its January 23, 2001, 8-K filing with the Securities and Exchange

Commission, MERCK fails to mention the cardiac and cardiothrombotic findings of the VIGOR

study:

> Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, Vioxx, Zocor, Cozaar/Hyzaar, Fosamax, and Singular, drove MERCK's performance for the year and created a powerful platform for growth." These products accounted for 57% of MERCK's worldwide human health sales for 2000 and 61% for the fourth quarter.
>
> Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. Vioxx, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinary successful 1999 launch, Vioxx has become the world's fastest growing branded prescription arthritis medicine, and it is already MERCK's second largest-selling medicine. In the United States, Vioxx now accounts for approximately 50% of the new prescriptions in the COX-2 class, despite being second to market in this class in the United States. Vioxx achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.
>
> A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes MERCK has requested based on the strong results of the VIGOR study, in which Vioxx reduced the risk of serious gastrointestinal outcomes research study, in which Vioxx reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that Vioxx significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

   59.    In response to the growing public expressions of concern over the cardiovascular

safety profile of Vioxx, MERCK issued a press release entitled "MERCK Confirms Favorable

13

Cardiovascular Safety Profile of Vioxx," dated May 22, 2001. This press release states that

Vioxx has a "favorable cardiovascular safety profile." The FDA would later tell MERCK:

> Your claim in the press release that Vioxx has a "favorable cardiovascular profile" is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx treatment group…as in the naproxen treatment group… in the VIGOR study.

60.    Despite admonishments from the FDA for its fraudulent marketing, MERCK

continued to increase sales of Vioxx and profits by withholding information from Plaintiff,

prescribing doctors, the consuming public, and the health care industry. For example, in

November of 2000, MERCK orchestrated the publication of a study in the New England Journal

of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular

risks associated with Vioxx consumption over naproxen consumption.

61.    On or about August 29, 2001, the Journal of American Medical Association

(JAMA) published a peer reviewed epidemiologic study by the Cleveland Clinic Foundation,

Cleveland, Ohio, showing that MERCK had concealed the risk of developing a "confirmed

adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction,

unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death,

ischemic stroke, and transient ischemic attacks") among Vioxx users in MERCK's clinical trials,

including VIGOR. The study found a statistically increased risk (of the magnitude of a four to

five-fold increase) for developing serious cardiovascular events, including heart attacks, in

Vioxx users over placebo and naproxen.

14

62.    In the JAMA study, the authors stated that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events."

63.    On September 17, 2001, Thomas W. Abrams, R. Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of MERCK, relating to "promotional activities and materials for the marketing of Vioxx (refecoxib) tablets."

64.    The Warning Letter, MERCK's **_third_** such letter from the FDA concerning Vioxx, stated that MERCK had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

65.    The eight-page Warning Letter outlines, in detail, the conduct of MERCK that supports the FDA's issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions":

> The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx/Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.
>
> Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding

15

similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

> Immediately ceasing all violative promotional activities, and the dissemination of all violative promotional materials for Vioxx.

> Issuing a "Dear Healthcare Provider" letter to correct false or misleading impressions and information. The proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

66.    MERCK knew the warnings contained in the label were ineffective and used its sales force and other marketing efforts to downplay (rather to improve) its communication of the risks posed by Vioxx. For example, in its 2001 annual report, MERCK states: "The Company also noted that a number of state and federal lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx....these lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are without merit and will vigorously defend them." Sales representatives were instructed not to discuss cardiovascular risks of Vioxx and were trained to "dodge" physicians' Vioxx-related safety concerns.

67.    In response to a growing body of evidence of Vioxx's safety problems, MERCK attempted to obfuscate this negative information by authoring and sponsoring reviews that set forth the unsubstantiated claim that naproxen had a cardioprotective effect and therefore accounted for the cardiovascular risks among its Vioxx users. However, this theory was debunked in January of 2002, by a Vanderbilt University School of Medicine human

16

epidemiologic peer-reviewed study published in *The Lancet*. The *Lancet* article concluded that there is an absence of a protective effect of naproxen or other non-aspirin, non-steroidal anti-inflammatory drugs on the risk of coronary heart disease.

68.     An article entitled "Why Do Cyclooxygenase-2 Inhibitors Cause Cardiovascular Events?' authored by Dr. Bing, Dr. Lomnicka, and others at the Department of Experimental Cardiology at the Huntington Medical Research Institute was published in the journal *Pharmacology* on February 6, 2002. The authors explained that a selective Cox-2 inhibitor, such as Vioxx, can promote adverse cardiovascular events by tipping the balance of prostacyclin and thromboxane in favor of thromboxane. This imbalance promotes both platelet aggregation and vasoconstriction, which can lead to catastrophic cardiovascular events, including stroke, heart attack, and pulmonary embolism.

69.     In October of 2001, MERCK learned of the publication of an article stating that there was a higher reporting rate for adverse events relating to renal and cardiovascular effects for Vioxx compared to Bextra,. MERCK responded by conducing an internal analysis of reported adverse events for Vioxx and Bextra. MERCK's analysis showed a greater reporting rate of myocardial infarction, as well as congestive heart failure and related illnesses, for Vioxx in comparison to Bextra. Once again, MERCK disregarded yet another signal of cardiovascular toxicity and failed to disclose it to the public. Instead, MERCK blamed the adverse result on an alleged discrepancy in the number of events entered into the regulatory database for the two drugs. As was the case with the Task Force analysis of 1997 and VIGOR study of 2000, MERCK once again searched for and found a reason to exonerate Vioxx and keep it on the market rather than provide accurate information about safety risks to physicians and patients.

17

70.     In approximately April of 2002, MERCK was required to place cardiovascular warnings on its Vioxx labeling based on the results of the VIGOR study.  In addition, MERCK was required to place new label warnings relaying that Vioxx 50 mg per day is not recommended for chronic use.

71.     An article by Dr. Solomon and others at Harvard Medical School, entitled "Relationship between Selective Cyclooxygenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults," was published in the April 2004 edition of the journal *Circulation*.  The Harvard authors concluded the following from their study:  "[R]ofecoxib [Vioxx] use was associated with an elevated relative risk of   AMI [acute myocardial infarction] compared with celecoxib [Bextra] use and no NSAID use.  Dosages of rofecoxib [greater than] 25 mg were associated with a higher risk than dosages [less than or equal to] 25 mg."

72.     An article by H.K. Choi in the May 2004 edition of the *American Journal of Medicine*, entitled "Effects of Rofecoxib and Naproxen on Life Expectancy Among Patients with Rheumatoid Arthritis: A Decision Analysis," concludes the following:  "Our analysis suggests a longer life expectancy with naproxen than rofecoxib [Vioxx] ....except those at low risk for myocardial infarction or at a high risk for gastrointestinal toxicity."

73.     David Graham, M.D., an employee of the Food & Drug Administration, made a poster presentation entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDs" at the 20th International Conference on Pharmacoepidemiology and Therapeutic Risk Management, held from August 22-25, 2004, in Bordeaux, France.  The data for the presentation was taken from a study done by Kaiser Permanente under a contract funded by the FDA, and concluded that Vioxx taken at more than

18

25 mg per day increased the risk of heart attack and sudden cardiac death by 300% in those enrolled in the Kaiser Permanente study.

74.   On August 26, 2004, Peter Kim, President of MERCK Research Laboratories, issued a press release stating the following: "MERCK strongly disagrees with the conclusions of an observational analysis by Graham, et al., presented at an international meeting this week . . . . MERCK stands behind the efficacy and safety, including cardiovascular safety of Vioxx."

75.   On September 27, 2004, MERCK informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as the APPROVe study, had recommended that the study be stopped early for safety reasons.

76.   The APPROVe study was not intended to be a cardiovascular risk assessment study.   It was commissioned by MERCK to look at the effect of Vioxx on people at risk for developing recurrent colon polyps.

77.   The APPROVe study demonstrated an increased risk of cardiovascular adverse events, including heart attacks and strokes, for the Vioxx population relative to the placebo population in the study.   Defendant Merck has falsely claimed that the APPROVe data only showed an increased risk for people taking Vioxx for more than 18 months.   Merck's claim has since been discredited.

78.   MERCK representatives informed the FDA in a September 28, 2004, meeting that MERCK would withdraw Vioxx from the United States market.

79.   MERCK and the FDA each announced the withdrawal of Vioxx from the United States market on September 30, 2004.   MERCK also announced worldwide withdrawal on the same day.

19

80.    An FDA analysis, based on data from the Kaiser Permanente study, projects that 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Bextra, another Cox II inhibitor, been used instead of Vioxx.

81.    Approximately 20 million people in the United States took Vioxx between its introduction in 1999 and its withdrawal in 2004, and, during this time period, MERCK engaged in a common scheme in marketing, distributing and/or selling Vioxx under the guise that it was safe and efficacious for persons such as Plaintiff.

82.    At all times relevant to this litigation, MERCK enjoyed a significant market share based upon false claims of Vioxx's efficacy, safety, and superiority which resulted a result of the actions of Defendants, including a very aggressive marketing program which included financial incentives to sales teams, the hiring of 700 new sales representatives, significant payments and other benefits to high-prescribing physicians, and a massive direct-to-consumer advertising and physician sampling program.   MERCK encouraged the prescription and use of Vioxx through aggressive marketing campaigns, including detailing of physicians by Defendants and others as well as direct-to-consumer advertising.   As such, Defendants had a duty not only to provide Plaintiff's prescribing physician with adequate warnings but also to provide Plaintiff with adequate warnings regarding Vioxx and the safety risks associated with ingestion of the drug.

83.    In an elaborate and sophisticated manner, MERCK aggressively marketed Vioxx directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include Vioxx on their formularies.  Faced with the increased demand for the drug by consumers and health care professionals that resulted from MERCK's successful advertising and marketing blitz, third party payors were compelled to add

20

Vioxx to their formularies. MERCK's marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Vioxx.

84.    MERCK knew of the cardiovascular risks before the U.S. Food and Drug Administration (the "FDA") approved Vioxx for sale, but they ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of Vioxx. MERCK's omission, suppression, and concealment of this important information enabled Vioxx to be sold to, and purchased, or paid for by the consumers at a grossly inflated price.

85.    Because MERCK engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted Vioxx as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of Vioxx, MERCK was able to justify pricing Vioxx significantly higher than the cost of generic aspirin. In reality, that price inflation was not justified. Had MERCK disclosed the truth about Vioxx, MERCK would not and could not have reaped the billions of dollars in Vioxx sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

86.    MERCK intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of Vioxx from Plaintiff, the public, the medical community, and others. This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of Vioxx, and prevented Plaintiff from obtaining all the material information that would be important to his decision as a reasonable person to purchase, pay for, and/or use Vioxx.

87.    MERCK's systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiff to purchase, pay for, and/or use Vioxx; and caused Plaintiff's losses and damages as asserted herein.

88.    Had MERCK performed adequate testing prior to approval and "market launch," the scientific data would have revealed significant increases in stroke and myocardial infarctions amongst the intended population of Vioxx consumers. Adequate testing would have shown that Vioxx possessed serious side effects. MERCK should have taken appropriate measures to ensure that their defectively designed product would not be placed into the stream of commerce and/or should have provided full and proper warnings that accurately and fully reflected the scope and severity of adverse effects associated with Vioxx.

89.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but MERCK intentionally suppressed this information in order for them to gain significant profits from continued Vioxx sales.

90.    MERCK's failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for MERCK and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

91.    At the time that MERCK manufactured, advertised and distributed VIOXX to consumers including Plaintiff, MERCK intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because MERCK knew that if such increased risks were adequately disclosed, consumers would not purchase Vioxx, but instead would purchase other cheaper and safer NSAID drugs.

22

92.    Defendants misrepresented the safety and effectiveness of Vioxx to prescribing physicians, Plaintiff, scientific journals, and the consuming public, and concealed or understated the dangerous side effects associated with ingestion of Vioxx. Defendants also engaged in such aggressive, improper, and dishonest promotion to certain physicians that the prescribing physicians were no longer able to make independent decisions as a learned intermediary on behalf of their patients.

93.    As a direct and legal result of the defective condition of the Vioxx manufactured and marketed by Defendants and ingested by Plaintiff, Plaintiff has suffered and continues to suffer from serious injuries, including, but not limited to, pain and suffering, physical injuries, disability, disfigurement, embarrassment, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical, nursing care and treatment, loss of earnings, loss of the ability to earn money in the future, and a shortened life span.

### B.    Factual Background Relating To Bextra Defendants

94.    This action arises out of the BEXTRA DEFENDANTS' manufacturing, selling, distributing, marketing and/or otherwise promoting Bextra in the State of Florida without proper warnings as to the dangers associated with its use.

95.    The pharmaceutical drug Bextra, manufactured by the BEXTRA DEFENDANTS, is defective, dangerous to human health, and unfit and unsuitable to be marketed and sold in commerce.

96.    Bextra (generic name valdecoxib) is a Cox-2 selective non-steroidal anti-inflammatory drug (NSAID).

23

97.    Bextra is used in the treatment of arthritis and is among the class of drugs known as NSAIDs, which are non-steroidal anti-inflammatory drugs including aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil).

98.    NSAIDs reduce pain and inflammation by blocking the body's production of pain transmission enzymes called cyclooxygenase (Cox-1 and Cox-2).  Cox enzymes trigger the sequential oxidation of various fatty acids to create prostaglandins.  Prostaglandins are important cogs in the physiology of pain, igniting hormone-like actions in the immediate vicinity of the cells that release them, thereby inducing inflammation, pain, and fever.

99.    Because Cox enzymes and prostaglandins increase the pain associated with tissue injury, the synthesis of prostaglandins by cells of injured tissue becomes a reasonable target for pain-management drugs.

100.    At the time the BEXTRA DEFENDANTS developed and manufactured Bextra, the BEXTRA DEFENDANTS intended to capture a portion of the extremely lucrative consumer market for Cox-2 specific inhibitors.

101.    Bextra was approved on November 19, 2001, for marketing in the United States. Bextra was a second-generation Cox-2 inhibitor from PFIZER, which also manufactures Celebrex (celexoxib).  Bextra, a stronger Cox-2 inhibitor than Celebrex, was approved for use in patients with osteoarthritis and adult rheumatoid arthritis.  Bextra is a selective Cox-2 inhibitor with similar selectiveness to Vioxx, a drug manufactured by Merck.

102.    The scientific data available during and after Bextra's approval should have alerted the BEXTRA DEFENDANTS that its formulation of Bextra could cause a higher risk of clotting, stroke and/or myocardial infarctions among Bextra users.  In addition, the scientific data

24

available should have also alerted the BEXTRA DEFENDANTS that Bextra users faced special risks of potentially fatal skin and systemic reactions that were unique to Bextra.

103.    Based upon the scientific data available in its own studies, the BEXTRA DEFENDANTS knew or in the exercise of reasonable care should have known that additional testing should be performed to determine the adverse health effects of Bextra on intended consumers.

104.    In approximately June of 2003, the BEXTRA DEFENDANTS completed a study that showed an excess risk of cardiovascular events for persons ingesting Bextra. As reported in the Wall Street Journal, "*PFIZER to Begin Test of Celebrex as Heart Attack Inhibitor; Questions Raised on Timing, C-5*," the BEXTRA DEFENDANTS had possession of the adverse cardiovascular data from a second study at least by August of 2004, but failed to make any disclosure until after October 15, 2004. The BEXTRA DEFENDANTS referred to the adverse cardiovascular thrombotic events at issue as an "open question" since the studies were on non-indicated uses, and the BEXTRA DEFENDANTS had not done the necessary long-term, prospective, randomized placebo controlled clinical trials to further quantify the risk.

105.    The BEXTRA DEFENDANTS were also aware of a study published by Dr. Eric Topol in August of 2001 in the *Journal of the American Medical Association* that reported an increased risk of thrombotic cardiovascular events in persons who used Cox-2 inhibitors. The study theorized that Cox-2 inhibitors interfered with platelet aggregation and had the potential to cause clot formation. Dr. Garrett Fitzgerald, of the University of Pennsylvania, in an editorial published in the *New England Journal of Medicine* on October 21, 2004, reported that it was known as early as 1999 that the Cox-2 inhibitors suppressed the formation of prostaglandin I2 in

25

healthy volunteers, that this action inhibited platelet aggregation *in vitro*, and that this may predispose patients to myocardial infarction or thrombotic stroke.

106.    Based upon available scientific data, the BEXTRA DEFENDANTS knew or should have known that the study group involved in its own testing did not adequately represent the cross-section of individuals who were the intended consumers likely to take Bextra. Therefore, the testing performed was inadequate.

107.    At all times up until Plaintiff was injured, the BEXTRA DEFENDANTS did not carry out research specifically to determine whether their product could cause the injury Plaintiff sustained, nor at what incidence it occurred, nor in what populations of foreseeable users this product created an increased risk.

108.    Had the BEXTRA DEFENDANTS conducted adequate testing prior to launching Bextra, the scientific data would have revealed significant increases in the risk of stroke and heart attacks amongst the intended population of Bextra consumers.

109.    In fact, post-marketing data has revealed increased risks of clotting, stroke and myocardial infarction, but that information was intentionally suppressed by the BEXTRA DEFENDANTS in order for the BEXTRA DEFENDANTS to gain significant profits from Bextra sales.

110.    At all times up until the Plaintiff was injured, the BEXTRA DEFENDANTS were aware that their product could cause serious skin reactions including Stevens Johnson Syndrome, Toxic Epidermal Necrolysis (TENS), and Erythema Multiforme, and did not adequately inform the Food and Drug Administration, the medical profession, the physician who prescribed the drug, Plaintiff, the pharmacy where the prescription was filled, or the consuming public that Bextra could cause these life threatening injuries.

111.    At all times up until Plaintiff was injured, the BEXTRA DEFENDANTS did not include any contradictions in its labeling as to certain types of persons who would be at higher risk in using Bextra, including those risk factors which Plaintiff had during the time that she ingested Bextra.

112.    At all times up until Plaintiff was injured, the BEXTRA DEFENDANTS were aware of but concealed from Plaintiff, the Food and Drug Administration, the medical profession, the physician who prescribed the drug, the pharmacy where the prescription was filled, and the consuming public that Bextra could cause serious skin reactions including Stevens Johnson Syndrome, Toxic Epidermal Necrolysis (TENS), and Erythema Multiforme and that there were certain users who were at an increased risk of having that injury occur.

113.    The BEXTRA DEFENDANTS' failure to conduct adequate testing and/or additional testing prior to its market launch was based upon the BEXTRA DEFENDANTS' desire to generate maximum financial gains for itself and to gain a significant market share in the highly competitive Cox-2 inhibitor market.

114.    At the time that the BEXTRA DEFENDANTS manufactured, advertised, and distributed Bextra to consumers, the BEXTRA DEFENDANTS intentionally ignored and/or withheld information regarding the increased risks of life threatening skin and systemic reactions, hypertension, stroke and/or myocardial infarctions because the BEXTRA DEFENDANTS knew that if such increased risks were disclosed, consumers would not purchase Bextra.

115.    At all times relevant hereto, the BEXTRA DEFENDANTS engaged in a marketing campaign with the intent that consumers would perceive Bextra as a safer and more efficacious drug than its competitors and, thereby, purchase Bextra.

27

116.    The BEXTRA DEFENDANTS widely and successfully marketed Bextra throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of Bextra in order to induce widespread use and consumption. Bextra was represented to relieve the pain and discomfort of arthritis, osteoarthritis, and related problems.    The BEXTRA DEFENDANTS made misrepresentations through product inserts, advertising, detailing, promotional materials, and other aggressive marketing efforts.

117.    The BEXTRA DEFENDANTS failed to perform adequate testing.    Adequate testing would have shown that Bextra possessed serious side effects.    The BEXTRA DEFENDANTS should have taken appropriate measures to ensure that its defectively designed product would not be placed into the stream of commerce and/or should have provided full and proper warnings that accurately and fully reflected the scope and severity of those side effects.

118.    Prior to the manufacturing, sale, and distribution of Bextra, the BEXTRA DEFENDANTS, through its officers, directors, and managing agents, had notice and knowledge from several sources that Bextra presented substantial and unreasonable risks of harm to the consumer. As such, Bextra consumers, including Plaintiff, were unreasonably subjected to risk of injury or death from the ingestion of Bextra.

119.    In addition, the BEXTRA DEFENDANTS had notice from numerous sources that Cox-2 inhibitors as a whole might present unreasonable risks of harm to consumers based upon various studies that had been published with regard to Vioxx and even its own Cox-2 inhibitor, Celebrex.    Rather than heed these warnings, the BEXTRA DEFENDANTS instead chose to attempt to capitalize on negative news about Vioxx in hopes of selling more Bextra.

120.    Despite such knowledge, the BEXTRA DEFENDANTS, through its officers, directors, and managing agents for the purpose of increasing sales and enhancing its profits,

28

knowingly and deliberately failed to remedy the known defects of Bextra, and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in the formulation of Bextra. The BEXTRA DEFENDANTS and its officers, agents and managers intentionally proceeded with the manufacturing, sale, and marketing of Bextra, knowing that persons would be exposed to serious potential dangers in order to advance their own pecuniary interests.

121.   At all times up until Plaintiff was injured, the BEXTRA DEFENDANTS were aware of but concealed from Plaintiff, the Food and Drug Administration, the medical profession, the physician who prescribed the drug, the pharmacy where the prescription was filled, and the consuming public that the pain for which Plaintiff ingested Bextra could be treated as effectively, more safely, and cheaply by over-the-counter NSAID drugs.

122.   In January of 2005, the FDA issued a letter reprimanding the BEXTRA DEFENDANTS for their false and misleading marketing of its products, including Bextra. The letter advised the BEXTRA DEFENDANTS that its marketing schemes "omit material facts, including the indication and risk information; fail to make adequate provision for the dissemination of the FDA-approved product labeling; and make misleading safety, unsubstantiated superiority, and unsubstantiated effectiveness claims" and "therefore [are] in violation of the Federal Food, Drug, and Cosmetic Act (Act) and FDA implementing regulations." The FDA called upon the BEXTRA DEFENDANTS to "immediately cease the dissemination of promotional materials" for Bextra.

123.   On April 7, 2005, Bextra was removed from the market. According to an FDA Public Health Advisory, Bextra was taken off the market for three reasons:

a.   increased risk of heart attack and stroke;

29

b.    increased risk of serious and life threatening skin reactions; and

c.    there was no advantage associated with Bextra when compared with other cheaper and safer NSAIDs.

124.    The BEXTRA DEFENDANTS promoted the sale of Bextra by misleading users about the efficacy of the product and by failing to adequately warn users (including Plaintiff) and prescribing physicians of the serious dangers which the BEXTRA DEFENDANTS knew or should have known were associated with the use of Bextra, including an increased risk of adverse cardiovascular events and severe skin reactions.

125.    The BEXTRA DEFENDANTS failed to perform adequate pre-marketing and post-marketing testing of Bextra and likewise failed to thoroughly and objectively analyze and/or report the data generated by the testing it conducted.  In promoting Bextra to the medical community, the FDA, and the general public, the BEXTRA DEFENDANTS systematically minimized the risks suggested by clinical data while overstating the alleged efficacy and purported safety of Bextra.  Adequate testing and objective reporting of those tests conducted would have demonstrated and revealed to the public and medical community the increased risk of cardiovascular events and severe skin reactions associated with the ingestion of Bextra.

126.    At the time the BEXTRA DEFENDANTS manufactured, advertised, and distributed the BEXTRA DEFENDANTS to consumers including Plaintiff, the BEXTRA DEFENDANTS intentionally or recklessly ignored and/or withheld information regarding the increased risks of serious skin reactions, hypertension, stroke and/or myocardial infarctions because the BEXTRA DEFENDANTS knew that if such increased risks were disclosed, consumers would not purchase Bextra, but instead would purchase other cheaper and safer NSAID drugs.

30

127.   The BEXTRA DEFENDANTS misrepresented the safety and effectiveness of Bextra to prescribing physicians, Plaintiff, scientific journals, and the consuming public, and concealed or understated the dangerous side effects associated with ingestion of Bextra.  The BEXTRA DEFENDANTS also engaged in such aggressive, improper, and dishonest promotion to certain physicians that the prescribing physicians were no longer able to make independent decisions as a learned intermediary on behalf of their patients.

128.   The BEXTRA DEFENDANTS engaged in a pattern of reckless behavior and manipulation with regard to the promotion and sale of Bextra in a successful effort to enhance profits at the expense of the public health.

129.   As a direct result of the BEXTRA DEFENDANTS' misconduct, the Plaintiff was prescribed and ingested Bextra and suffered significant harm.

130.   Plaintiff used Bextra as prescribed and in a foreseeable manner.

131.   Plaintiff ingested Bextra that was in a condition substantially identical to the condition in which it was manufactured and sold.

132.   Plaintiff would not have ingested Bextra had the BEXTRA DEFENDANTS properly disclosed the risks associated with the drug.

133.   As a direct and proximate result of the defective condition of the Bextra manufactured and marketed by the BEXTRA DEFENDANTS and ingested by Plaintiff, Plaintiff has suffered and continues to suffer from serious injuries, including, but not limited to, pain and suffering, physical injuries, disability, disfigurement, embarrassment, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical, nursing care and treatment, loss of earnings, loss of the ability to earn money in the future, and a shortened life span.

31

## COUNT I

### STRICT LIABILITY (as to all Defendants)

Plaintiff adopts by reference all of the allegations contained in Paragraphs 1 through 133 above, each inclusive, as though fully set forth herein, pursuant to Rule 1.130(b), Florida Rules of Civil Procedure.

134.    The Vioxx and Bextra ingested by Plaintiff were defective and unreasonably dangerous when it left the possession of the MERCK and the BEXTRA DEFENDANTS in that:

a.    When placed in the stream of commerce, Vioxx and Bextra contained unreasonably dangerous design defects and were not reasonably safe as intended to be used, subjecting Plaintiff to risks which exceeded the benefits of the drugs;

b.    When placed in the stream of commerce, Vioxx and Bextra were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with Plaintiff's ailment;

c.    Vioxx and Bextra contained insufficient warnings to alert Plaintiff, consumers, and prescribing physicians of severe and life threatening complications and side effects including, but not limited to arterial thrombus;

d.    There was misleading advertising and promotion concerning the benefits of using Vioxx and Bextra;

e.    There were inadequate post-marketing warnings or instructions for Vioxx and Bextra because, after MERCK and the BEXTRA DEFENDANTS knew or should have known of the significant risks associated with the use of Vioxx and Bextra, MERCK and the BEXTRA DEFENDANTS failed to provide adequate warnings to Plaintiff, consumers, and prescribing physicians, and continued to aggressively promote and advertise direct-to-consumers the sale and use of Vioxx and Bextra; and

f.    The Vioxx and Bextra ingested by Plaintiff had not been materially altered or modified prior to use.

135.    Plaintiff used Vioxx and Bextra for their intended purpose of pain management.

32

136.    MERCK and the BEXTRA DEFENDANTS, as manufacturers of prescription drugs, are held to the level of knowledge of an expert in the field.

137.    Plaintiff's prescribing physician did not have substantially the same knowledge as MERCK and the BEXTRA DEFENDANTS, or the level of knowledge that would have been gleaned from an adequate warning from MERCK and the BEXTRA DEFENDANTS.

138.    The warnings that were given by MERCK and the BEXTRA DEFENDANTS to prescribing physicians, consumers, and Plaintiff were not accurate, clear, and/or unambiguous.

139.    MERCK and the BEXTRA DEFENDANTS had a continuing duty to warn the Plaintiff, consumers and prescribing physicians of the dangerous risks and reactions associated with Vioxx and Bextra.

140.    Plaintiff could not have discovered any defect in the product through the exercise of care.

141.    As a direct and legal result of the defective condition of Vioxx and Bextra and their respective inadequate warnings, Plaintiff suffered serious personal injury, has sustained economic losses, and has expended (and/or may in the future be required to expend) fair and reasonable expenses for necessary health care, attention and services, and has and/or may incur incidental and related expenses.

WHEREFORE, Plaintiff demands judgment against MERCK and the BEXTRA DEFENDANTS for damages, as well as costs of this action and a trial by jury of all issues to be tried.

33

## COUNT II

### NEGLIGENCE (as to all Defendants)

Plaintiff adopts by reference all the allegations contained in Paragraphs 1 through 133 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

142.    At all times material hereto, MERCK and the BEXTRA DEFENDANTS had a duty to Plaintiff to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, labeling, assembling, packaging, distribution and sale of Vioxx and Bextra.

143.    MERCK and the BEXTRA DEFENDANTS were negligent in their actions, misrepresentations, and omissions toward Plaintiff and Plaintiff's prescribing physician in the following ways:

      a.    They failed to include adequate warnings with their respective drugs that would have alerted consumers and physicians to the potential risks and serious side effects of Vioxx and Bextra;

      b.    Failed to adequately and properly test Vioxx and Bextra before placing the drugs on the market;

      c.    Failed to provide adequate post-marketing warnings or instructions after MERCK and the BEXTRA DEFENDANTS knew of the significant risks of personal injury and death as identified herein and other serious side effects resulting from the use of Vioxx and BEXTRA;

      d.    Failed to adequately warn Plaintiff that Vioxx and Bextra should not be used by patients with any risk factors for these adverse effects such as family history of ischemic heart disease, or risk factors for ischemic cardiovascular disease;

      e.    Failed to adequately disclose and warn Plaintiff that Plaintiff undertook the risk of adverse events and death by ingesting Vioxx and Bextra; and

34

    f.  Failed to adequately and timely inform the health care industry of the risks of serious personal injury and death resulting from Vioxx and Bextra ingestion as described therein.

  144. MERCK and the BEXTRA DEFENDANTS knew or should have known that Vioxx and Bextra caused unreasonably dangerous risks and serious side effects of which Plaintiff was unaware. MERCK and the BEXTRA DEFENDANTS nevertheless aggressively advertised, marketed, sold and distributed Vioxx and Bextra knowing that there were safer products and options for treatment of pain due to inflammation.

  145. As a direct and legal result of the negligence of MERCK and the BEXTRA DEFENDANTS, Plaintiff suffered serious injury, and Plaintiff seeks all damages allowed under the law.

  WHEREFORE, Plaintiff demands judgment against MERCK and the BEXTRA DEFENDANTS for damages, as well as costs of this action and a trial by jury of all issues to be tried.

**COUNT III**

**<u>NEGLIGENT MISREPRESENTATION (as to all Defendants)</u>**

  Plaintiff adopts by reference all of the allegations contained Paragraphs 1 through 133 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

  146. MERCK and the BEXTRA DEFENDANTS negligently misrepresented to Plaintiff and Plaintiff's prescribing physician the safety and effectiveness of Vioxx and Bextra and/or negligently misrepresented material information regarding Vioxx and Bextra and/or negligently misrepresented adverse information regarding the safety and effectiveness of the drugs Vioxx and Bextra.

35

147.    The negligent misrepresentations of MERCK and the BEXTRA DEFENDANTS were communicated to Plaintiff's prescribing physician with the intent that they reach the Plaintiff, and that the effect of such representations would be that prescriptions would be written for Vioxx and Bextra for the consuming public, including Plaintiff.

148.    MERCK and the BEXTRA DEFENDANTS misrepresented safety information regarding Vioxx and Bextra with the intention and specific desire that Plaintiff, Plaintiff's prescribing physician, other dispensing entities, and the consuming public would rely on such information in selecting, requesting, or prescribing treatment.

149.    MERCK and the BEXTRA DEFENDANTS misrepresented material, adverse information regarding the safety and effectiveness of Vioxx and Bextra.

150.    MERCK and the BEXTRA DEFENDANTS made these misrepresentations and actively concealed adverse information at a time when MERCK and the BEXTRA DEFENDANTS knew, or should have known, that Vioxx and Bextra had defects, dangers, and characteristics that were other than what MERCK and the BEXTRA DEFENDANTS had represented to prescribing doctors, other dispensing entities, the FDA and the consuming public, including the Plaintiff herein.

151.    The misrepresentations of MERCK and the BEXTRA DEFENDANTS were perpetuated directly and/or indirectly by the employees, agents and/or other detail persons of MERCK and PFIZER.

152.    The misrepresentations of MERCK and the BEXTRA DEFENDANTS constitute a continuing tort.

153.    Through the Vioxx and Bextra product inserts, advertising, promotional materials, detailing, and aggressive marketing, MERCK and the BEXTRA DEFENDANTS continued to

36

misrepresent the potential risks and benefits associated with Vioxx and Bextra both before and after Plaintiff's ingestion of the drug.

154.    MERCK and the BEXTRA DEFENDANTS had a post-sale duty to warn Plaintiff, the consuming public, and prescribing physicians about the potential risks and complications associated with Vioxx and Bextra in a timely manner.

155.    MERCK and the BEXTRA DEFENDANTS misrepresented the safety and efficacy of Vioxx and Bextra in their labeling, advertising, product inserts, detailing, promotional materials, or other marketing efforts.

156.    Plaintiff, Plaintiff's prescribing physician, and other dispensing entities justifiably relied on and/or were induced by the misrepresentations of MERCK and the BEXTRA DEFENDANTS to Plaintiff's detriment.

157.    As a direct and legal result of the negligent misrepresentations of MERCK and the BEXTRA DEFENDANTS, Plaintiff has suffered serious injuries.

WHEREFORE, Plaintiff demands judgment against MERCK and the BEXTRA DEFENDANTS for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

**COUNT IV**

**<u>FRAUD (as to all Defendants)</u>**

Plaintiff adopts by reference all of the allegations contained Paragraphs 1 through 133 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

158.    MERCK and the BEXTRA DEFENDANTS fraudulently or intentionally misrepresented to Plaintiff and/or Plaintiff's prescribing physician the safety and effectiveness of

37

Vioxx and Bextra and/or fraudulently or intentionally concealed material information regarding the drugs and/or fraudulently or intentionally misrepresented adverse information regarding the safety and effectiveness of Vioxx and Bextra.

159.    The fraudulent or intentional misrepresentations of MERCK and the BEXTRA DEFENDANTS were communicated to Plaintiff's prescribing physician with the intent that they reach the Plaintiff.

160.    MERCK and the BEXTRA DEFENDANTS knew that their representations were false.

161.    MERCK and the BEXTRA DEFENDANTS made the fraudulent or intentional misrepresentations and/or actively concealed information about the risks and efficacy of Vioxx and Bextra with the intention and specific desire that the Plaintiff, the Plaintiff's prescribing physician, dispensing entities and the consuming public would rely on such false information in selecting treatment for pain and inflammation.

162.    MERCK and the BEXTRA DEFENDANTS intentionally concealed material, adverse information regarding the safety and effectiveness of their respective products.

163.    MERCK and the BEXTRA DEFENDANTS made these fraudulent or intentional misrepresentations and actively concealed adverse information at a time when the Defendants knew that Vioxx and Bextra had defects, dangers, and characteristics that were other than what the Defendants had represented to the prescribing doctors or other dispensing entities, the FDA and the consuming public, including the Plaintiff herein.   Specifically, MERCK and the BEXTRA DEFENDANTS fraudulently or intentionally misrepresented to and/or actively concealed from Plaintiff, Plaintiff's prescribing physician, other dispensing entities, the FDA and

38

the consuming public the following adverse information regarding the Vioxx and Bextra ingested

by the Plaintiff:

      a.    Failed to advise Plaintiff, Plaintiff's prescribing physician, and others that
           Vioxx and Bextra carried risks of serious adverse effects;

      b.    Failed to advise Plaintiff, Plaintiff's prescribing physician, and others that
           there were serious risks of thrombotic events associated with Vioxx and
           Bextra, and, instead, Defendants aggressively marketed, promoted,
           advertised directly to consumers, and/or sold Vioxx and Bextra as if there
           were no risks; and

      c.    Failed to advise Plaintiff, Plaintiff's prescribing physician, and others that
           prior studies, research, reports and/or testing had been conducted linking
           Vioxx and Bextra to serious adverse actions.

    164.    The fraudulent or intentional misrepresentations and/or active concealment by

MERCK and the BEXTRA DEFENDANTS were perpetuated directly and/or indirectly by the

Defendant and their employees, agents and/or other detail persons.

    165.    The fraudulent or intentional misrepresentations and/or concealment by MERCK

and the BEXTRA DEFENDANTS constitute a continuing tort.

    166.    Through the MERCK and the BEXTRA DEFENDANTS' product inserts,

advertising, detailing, promotional materials, and aggressive marketing efforts, Defendants

continued to fraudulently or intentionally misrepresent the potential risks associated with Vioxx

and Bextra.

    167.    MERCK and the BEXTRA DEFENDANTS had a post-sale duty to warn

Plaintiff, consumers, and prescribing physicians of the risks of Vioxx and Bextra in their

labeling, advertising, product inserts, detailing, promotional materials, and other marketing

efforts.

168.    MERCK and the BEXTRA DEFENDANTS fraudulently or intentionally misrepresented the safety and efficacy of Vioxx and Bextra in their labeling, advertising, product insert, promotional materials, detailing, or other marketing efforts.

169.    Plaintiff, Plaintiff's prescribing physician, and other dispensing entities justifiably relied on and/or were induced by the fraudulent or intentional misrepresentations and/or active concealment by MERCK and the BEXTRA DEFENDANTS to Plaintiff's detriment.

170.    As a direct and legal result of the fraudulent or intentional misrepresentations of and/or active concealment by MERCK and the BEXTRA DEFENDANTS, Plaintiff suffered serious injuries.

WHEREFORE, Plaintiff demands judgment against MERCK and the BEXTRA DEFENDANTS for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

## JURY TRIAL DEMANDED ON ALL ISSUES

Dated this the ___ day of ___ 2007.

BRENDA S. FULMER, Esq. (FBN: 999891)
C. TODD ALLEY, Esq. (FBN: 321788)
JAMES D. CLARK, Esq. (FBN: 191311)
DON GREIWE, Esq. (FBN: 218911)
ALLEY, CLARK, GREIWE & FULMER
701 E. Washington Street
P.O. Box 3127
Tampa, FL 33601-3127
Tele: (813) 222-0977
Fax: (813) 224-0373
Attorneys for Plaintiff

40

Form 1.997

**Civil Cover Sheet**

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075. (See instructions on the reverse of the form.)

I.    **CASE STYLE**

IN THE CIRCUIT COURT IN AND FOR ALACHUA COUNTY, FLORIDA

Plaintiff:    ESTHER MORGAN

Case No.: ⟨handwritten⟩ 01·07·CA·621

v.

Judge: _____ J

Defendant:    Merck, et al.

II.                    TYPE OF CASE:    (Place an x in one box only. If the case fits more than one type of case, select the most definitive.)

Domestic Relations        Torts            Other Civil

__ Simpl. dissolution      __ Prof. Mal.    __ Contracts
__ Dissolution             _X_ Prod. Liab.  __ Condominium
__ Support - IV-D          __ Auto Negl.    __ Real Property/Mtg. Forecl.
__ Support - Non IV-D      __ Other Negl.   __ Eminent domain
__ URESA - IV-D                             __ Other
__ URESA - Non IV-D
__ Domestic violence
__ Other domestic relations

III.    Is Jury Trial Demanded in Complaint?

      _X_  Yes
      ___  No

Date: ⟨handwritten⟩ 2|6|07

Signature of attorney for
party initiating action

⟨stamp⟩ 2007 FEB - 8 AM 11:28  J.K. "BUDDY" IRBY CLERK OF COURTS ALACHUA COUNTY FL.  FILED


Case: 2007 CA 000621

1

O7.CA.621

# Alley ◆ Clark ◆ Greiwe ◆ Fulmer
## CIVIL TRIAL LAWYERS

**BRENDA S. FULMER**
bfulmer@tampatriallawyers.com

701 East Washington Street
Post Office Box 3127
Tampa, Florida 33601-3127

Tel: (813) 222-0977
Fax: (813) 224-0373

February 5, 2007

Alachua County Courthouse
Attn: Circuit Civil
P.O. Box 600
Gainesville, FL 32602

     RE:    Morgan v. Merck, et al.

Dear Clerk:

Enclosed is an original complaint along with our firm's filing fee check. Please return the conformed copy of the complaint and summonses at your earliest convenience.

If you have any questions or concerns, please contact my assistant, Jenny Dixon, at 1-800-840-0977.

Sincerely yours,

Brenda S. Fulmer

BSF/jb

Enclosures

2007 FEB -8 AM 11:27
JK "BUDDY" IRBY
CLERK OF COURTS
ALACHUA COUNTY, FL.

FILED OK

2-8-7 c K #11609 $855.00

Shipping Label

From:   Origin ID: KYOA   (813)222-0977
Jenny Dixon
Alley, Clark, Greiwe & Fulmer
701 E. Washington St.

Tampa, FL 33602


FedEx
Express

SHIP TO:   (352)374-3636        BILL SENDER
**Circuit Civil**
**Alachua Co. Courthouse**
**201 E. University Ave.**

**Gainesville, FL 32602**

Ship Date: 06FEB07
ActWgt: 1 LB
System#: 9739233/INET2600
Account#: S ********

Delivery Address Bar Code



Ref #   151-221
Invoice #
PO #
Dept #

** 2DAY **                                              THU
                                                    Deliver By:
TRK#   7990 8228 0420    FORM        08FEB07
                         0201            JAX        AA

32602   -FL-US

SC CDKA





# Shipping Label

**This shipping label constitutes the air waybill for this shipment.**                    [View all labels]

1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

https://www.fedex.com/fsmShip/labelDomAction.do?method=doLabelClick                    2/6/2007

# EXHIBIT A



## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, STATE OF FLORIDA

ESTHER MORGAN,

      Plaintiff,

vs.

MERCK & CO., INC., PFIZER INC.,
PHARMACIA CORPORATION,
a wholly-owned subsidiary of PFIZER INC., and
PHARMACIA & UPJOHN COMPANY, LLC, a
wholly-owned subsidiary of PHARMACIA
CORPORATION,

      Defendants.

Case No.: 01-07-CA-691

Division: _____J_____

if you are a person with a disability who needs
any accommodation in order to participate in
this proceeding, you are entitled  at no cost to
you, to the provision of certain assistance. Persons
with a disability who need any accommodation in
order to participate should call Jan Phillips, ADA
Coordinator, Alachua County Courthouse, 201
E. University Ave., Gainesville, FL 32601 at
(352) 337-6237 within two (2) workings days of
your receipt of this notice; if you are hearing
impaired call (900) 955-8771; if you are
voice impaired, call (800) 955-8770

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the
Complaint in the above styled cause upon the Defendant(s)

          PFIZER INC.
          c/o C.T. Corporation System
          1200 S. Pine Island Rd.
          Plantation, FL 33324

     Each Defendant is hereby required to serve written defenses to said Complaint or petition
on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq. (FBN: 999891)**
**C. TODD ALLEY, Esq. (FBN: 321788)**
**JAMES D. CLARK, Esq. (FBN: 191311)**
**DON GREIWE, Esq. (FBN: 218911)**
ALLEY, CLARK, GREIWE & FULMER
701 E. Washington Street
P.O. Box 3127
Tampa, FL 33601-3127
Telephone: (813) 222-0977
Fax: (813) 224-0373
Attorneys for Plaintiff



1

Fed Ex  to Atty  5/9/07   PJT

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

WITNESS my hand and seal of said Court on ___*7 ι ὲ.   ᶜᵢ*___ , 2007.

Clerk of the Circuit Court

(Court Seal)

By:___*῁Ɗ. Ἴ ḥ ϵ ᵢ ṟ ϵ ᵢ₃*_____

Deputy Clerk

2



## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, STATE OF FLORIDA

ESTHER MORGAN,

      Plaintiff,

vs.

MERCK & CO., INC., PFIZER INC.,
PHARMACIA CORPORATION,
a wholly-owned subsidiary of PFIZER INC., and
PHARMACIA & UPJOHN COMPANY, LLC, a
wholly-owned subsidiary of PHARMACIA
CORPORATION,

      Defendants.

_____/

Case No.: O₁ · O₇ · C A · 6 ₂ 1

Division: _____

If you are a person with a disability who needs
any accommodation in order to participate in
this proceeding, you are entitled, at no cost to
you, to the provision of certain assistance. Persons
with a disability who need any accommodation in
order to participate should call Jan Phillips, ADA
Coordinator, Alachua County Courthouse, 201
E. University Ave., Gainesville, FL 32601 at
(352) 337-6237 within two (2) workings days of
your receipt of this notice; if you are hearing
impaired call (800) 955-8771; if you are
voice impaired, call (800) 955-8770.

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the
Complaint in the above styled cause upon the Defendant(s)

             PHARMACIA CORPORATION    , A WHOLLY-OWNED SUBSIDIARY
             c/o C.T. Corporation System      OF PFIZER, INC. DT
             1200 S. Pine Island Rd.
             Plantation, FL 33324

      Each Defendant is hereby required to serve written defenses to said Complaint or petition
on Plaintiff's attorney, whose name and address is

            **BRENDA S. FULMER, Esq. (FBN: 999891)**
            **C. TODD ALLEY, Esq. (FBN: 321788)**
            **JAMES D. CLARK, Esq. (FBN: 191311)**
            **DON GREIWE, Esq. (FBN: 218911)**
            **ALLEY, CLARK, GREIWE & FULMER**
            **701 E. Washington Street**
            **P.O. Box 3127**
            **Tampa, FL 33601-3127**
            **Telephone: (813) 222-0977**
            **Fax: (813) 224-0373**
            **Attorneys for Plaintiff**



1

Fed Ex to Atty 10/9/07  DT

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

WITNESS my hand and seal of said Court on ___7 ₑ ₑ.  ₉___ , 2007.

Clerk of the Circuit Court

(Court Seal)

By:_____
        Deputy Clerk

2



## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, STATE OF FLORIDA

ESTHER MORGAN,

     Plaintiff,

vs.

MERCK & CO., INC., PFIZER INC.,
PHARMACIA CORPORATION,
a wholly-owned subsidiary of PFIZER INC., and
PHARMACIA & UPJOHN COMPANY, LLC, a
wholly-owned subsidiary of PHARMACIA
CORPORATION,

     Defendants.

_____/

Case No.: C. 07 CA. 601
Division: _____J_____

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled at no cost to you, to the provision of certain assistance. Persons with a disability who need any accommodation in order to participate should call Jan Phillips, ADA Coordinator, Alachua County Courthouse, 201 E. University Ave., Gainesville, FL 32601 at (352) 337-6237 within two (2) workings days of your receipt of this notice; if you are hearing impaired call (800) 955-8771; if you are voice impaired, call (800) 955-8770.

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint in the above styled cause upon the Defendant(s)

     Pharmacia & Upjohn Company, LLC , A WHOLLY OWNED SUBSIDIAR
     c/o C.T. Corporation System     OF PHARMACIA CORP. (DT)
     1200 S. Pine Island Rd.
     Plantation, FL 33324

     Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq. (FBN: 999891)**
**C. TODD ALLEY, Esq. (FBN: 321788)**
**JAMES D. CLARK, Esq. (FBN: 191311)**
**DON GREIWE, Esq. (FBN: 218911)**
**ALLEY, CLARK, GREIWE & FULMER**
701 E. Washington Street
P.O. Box 3127
Tampa, FL 33601-3127
Telephone: (813) 222-0977
Fax: (813) 224-0373
Attorneys for Plaintiff



Case: 2007 CA 000621
DEV566743CR
DKT: 5007-R

1

Fed Eu to atty 2/9/07   DT

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

WITNESS my hand and seal of said Court on _____ ꓶ ⸝ ꞓ⸝ ꞔ _____, 2007.

Clerk of the Circuit Court

(Court Seal)

By: ꞓ ꓐ⸝ ꓔꞕ ꞓ Ꭓ ꞓ ꞏ
                     Deputy Clerk

2



## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, STATE OF FLORIDA

ESTHER MORGAN,

     Plaintiff,

               Case No.: C1·C·"1·CH  (nJ1
               Division: _____

vs.

MERCK & CO., INC., PFIZER INC.,
PHARMACIA CORPORATION,
a wholly-owned subsidiary of PFIZER INC., and
PHARMACIA & UPJOHN COMPANY, LLC, a
wholly-owned subsidiary of PHARMACIA
CORPORATION,

     Defendants.

_____/

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Persons with a disability who need any accommodation in order to participate should call Jan Phillips, ADA Coordinator, Alachua County Courthouse, 201 E. University Ave., Gainesville, FL 32601 at (352) 337-6237 within two (2) workings days of your receipt of this notice; if you are hearing impaired call (800) 955-8771, if you are voice impaired, call (800) 955-8770.

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint in the above styled cause upon the Defendant(s)

**MERCK & CO., INC.**
**c/o CT Corporation, Reg. Agent**
**1200 S. Pine Island Road**
**Plantation, FL 33324**

     Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq. (FBN: 999891)**
**C. TODD ALLEY, Esq. (FBN: 321788)**
**JAMES D. CLARK, Esq. (FBN: 191311)**
**DON GREIWE, Esq. (FBN: 218911)**
ALLEY, CLARK, GREIWE & FULMER
701 E. Washington Street
P.O. Box 3127
Tampa, FL 33601-3127
Telephone: (813) 222-0977
Fax: (813) 224-0373
Attorneys for Plaintiff


Case: 2007 CR 000621

1

7ud ic   to atty  J/9/07   JSJ

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

    WITNESS my hand and seal of said Court on _____ 7 ι ι.  ᵠ_____ , 2007.

                                        Clerk of the Circuit Court

(Court Seal)

                                        By: _D. Ih errou_____
                                              Deputy Clerk

2

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

Case No.: _____

ESTHER MORGAN,

        Plaintiff,

vs.

MERCK & CO., INC., PFIZER, INC.,
PHARMACIA CORPORATION,
a wholly-owned subsidiary of PFIZER, INC., and
PHARMACIA & UPJOHN COMPANY, LLC, a
wholly-owned subsidiary of PHARMACIA
CORPORATION,

        Defendants.

_____/

## MERCK & CO., INC.'S CONSENT TO REMOVAL

Merck & Co., Inc. ("Merck") states as follows:

1.    Merck consents to the removal of the above-captioned action, originally

filed in the Circuit Court of the Eighth Judicial Circuit in and for Alachua County,

Florida, assigned Case No. 01-07-CA-621 (J).

2.    This consent to removal is made within thirty (30) days of the date Merck

first ascertained that this action was removable.

3.    In consenting to removal, Merck does not intend to waive any rights or

defenses to which it is otherwise entitled, including but not limited to, those items set

forth in Federal Rule of Civil Procedure 12(b).

Dated: March 16, 2007.                    Respectfully submitted,

SQUIRE, SANDERS & DEMPSEY L.L.P.
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone:    561.650.7200
Facsimile:    561.655.1509

_____
Patricia E. Lowry
Florida Bar No. 332569
John B. T. Murray, Jr.
Florida Bar No. 962759
Sarah Shullman
Florida Bar No. 888451

*Attorneys for Defendant Merck & Co., Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via

U.S. Mail this ___16___ day of March, 2007 to:

Brenda S. Fulmer
C. Todd Alley
James D. Clark
Donald W. Greiwe
ALLEY CLARK GREIWE & FULMER
701 E. Washington Street
P.O. Box 3127
Tampa, FL 33601-3127

_____
Sarah Shullman

WPB/497919.1

2

# EXHIBIT C

IN THE CIRCUIT COURT IN AND FOR ALACHUA COUNTY, FLORIDA

ESTHER MORGAN,

     Plaintiff,

vs.                              CASE NO.: 01-07-CA-621

MERCK & CO., INC.; PFIZER INC.;
PHARMACIA CORPORATION,
a wholly-owned subsidiary of PFIZER INC.;
and PHARMACIA & UPJOHN COMPANY,
LLC, a wholly-owned subsidiary of
PHARMACIA CORPORATION,

     Defendants.

_____/

## NOTICE OF FILING NOTICE OF REMOVAL OF CIVIL ACTION

TO:    Clerk of the Circuit Court of Alachua County, Florida:

     You are hereby notified that defendants Pfizer Inc., Pharmacia Corporation, and Pharmacia & Upjohn Company LLC (incorrectly captioned as "Pharmacia & Upjohn Company, LLC") have on the 16th day of March, 2007, filed in the United States District Court for the Northern District of Florida, Gainesville Division, a Notice of Removal to Federal Court of the above-entitled cause, a copy of which is attached hereto and made a part of the Notice to Clerk, for your information and guidance. This Notice serves to effect full removal of this case pursuant to 28 U.S.C. § 1446(d), thereby precluding this state court from proceeding further in this case, unless and until this case is remanded hereto by the United States District Court.

                                          Edward W. Gerecke
                                          Florida Bar No. 328332
                                          CARLTON FIELDS, P.A.
                                          Post Office Box 3239
                                          Tampa, Florida 33601
                                          Telephone:    (813) 223-7000
                                          Facsimile:     (813) 229-4133

E-Mail:        egerecke@carltonfields.com

Attorneys for Pfizer Inc., Pharmacia Corporation,
and Pharmacia & Upjohn Company LLC

## CERTIFICATE OF SERVICE

I CERTIFY that copies of this pleading were mailed to Brenda S. Fulmer, C. Todd Alley,

and James D. Clark, 701 E. Washington Street, P.O. Box 3127, Tampa, Florida 33601, Patricia E.

Lowry, John B. T. Murray, Jr., and Dori K. Stibolt, 777 South Flagler Drive, West Palm Beach, FL

33401, this 16th day of March, 2007.

_____
Attorney